IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VIRSNA A. SIENG,

    Petitioner,

v.

WARDEN, BELMONT
CORRECTIONAL INSITUTION,

    Respondent.

CASE NO. 2:20-CV-1531
JUDGE MICHAEL H. WATSON
MAGISTRATE JUDGE CHELSEY M. VASCURA

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This case has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Columbus' General Order 14-1 regarding assignments and references to United States Magistrate Judges.

This matter is before the Court on its own motion under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 4"). Pursuant to Rule 4, the Court conducts a preliminary review to determine whether "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief . . . ." If it does so appear, the petition must be dismissed. *Id*. Applying these standards, it is **RECOMMENDED** that this action be **DISMISSED**.

### I.    BACKGROUND

Petitioner challenges his December 14, 2017 state-court convictions after a jury trial in the Franklin County Court of Common Pleas on possession of cocaine with major drug offender and firearm specifications and having a weapon while under disability. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

{¶ 2} The testimony at the suppression hearing reveals that on July 10, 2014, Detective Marcus Blevins of the Hilliard Division of Police was conducting surveillance of a home where appellant lived with his parents at 5521 Mirage Drive in Hilliard, Ohio. Blevins was part of the High Intensity Drug Trafficking Area ("HIDTA") task force, a cooperative effort between state and federal law enforcement to combat illegal drug activities in Columbus, Ohio and surrounding areas.

{¶ 3} At approximately 8:44 a.m., Blevins observed a Columbus Division of Police ("CPD") "paddy wagon" arrive at the residence. (Tr. Vol. 1 at 42.) According to Blevins, he met with one of the responding CPD officers, Brian Bishop, shortly after Bishop left appellant's residence, and Bishop told him it was the second time that morning that CPD had responded to a call from a female at the residence who reported a break-in. Bishop reported that a sweep of the residence revealed no intruder.

{¶ 4} At approximately 10:19 a.m., Blevins saw CPD return to the residence a third time. On this occasion, police determined appellant's girlfriend was suffering either from a drug overdose or mental health issues, and they called paramedics to the scene. Appellant's girlfriend was taken to the hospital for medical assistance.

{¶ 5} About one-half hour later, a maroon Chevrolet Impala with Vermont license plates stopped in front of appellant's residence, and Blevins saw the driver get out of the vehicle and go inside appellant's home. Less than one hour later, the same man left the residence and drove away. Blevins called CPD Detective Clint Smith, another member of the HIDTA task force, to provide Smith with the vehicle description and request a traffic stop.

{¶ 6} According to Smith, after he caught up with the Impala, he observed the operator commit numerous traffic violations. Because Smith was operating an unmarked police vehicle, he radioed ahead to Deputy Sheriff Robert McKee, a certified K-9 patrol officer with the Franklin County Sheriff's Office, who was also a member of the HIDTA task force. Smith provided McKee with a description of the vehicle and informed him of the events that he and Blevins had previously observed. McKee followed the Impala and observed the vehicle operator "[f]ail to yield for a red light at Roberts and Hillard-Rome." (Tr. Vol. 1 at 65.) On cross-examination, however, McKee could not recall whether he had personally observed the violation or he had received the information from Smith.

{¶ 7} McKee stopped the Impala at approximately 1:00 p.m., and he subsequently learned that the operator, Fredrick Akins, was a federal parolee who had been convicted of crimes related to illegal narcotics. According to McKee, as he walked his dog, Blek, around the vehicle, Blek alerted to the presence of narcotics. A subsequent search of the vehicle did not reveal any narcotics. McKee explained that trained drug detection dogs will often alert to the presence of

narcotics for a period of time after they have either been consumed or removed from the vehicle.

{¶ 8} About the same time McKee completed the traffic stop, Smith arrived at the scene and spoke with Akins. According to Smith, Akins admitted that he had just been to appellant's home and that he believed appellant had a firearm and a large quantity of cocaine in the home. He told Smith appellant was looking for a way to get the cocaine out of his house. Akins also told Smith appellant was under the influence of narcotics.

{¶ 9} Smith relayed the information to Blevins who was still watching appellant's home. At or about that same time, Blevins observed appellant leave his house and proceed on foot to his vehicle. According to Blevins, appellant had his "head on a swivel," which meant that he was scanning the area carefully as he approached his vehicle. (Tr. Vol. I at 20.) Blevins then saw appellant remove an item or package from the trunk of his car before going back inside. Blevins described the item as a white plastic bag. Blevins next observed appellant return to his vehicle a short time later and drive off. Blevins requested a traffic stop and gave Smith and McKee a description of appellant's Acura.

{¶ 10} Smith testified at the suppression hearing that after he caught up with appellant's vehicle, he observed appellant commit several traffic violations, including failure to signal when turning south from Roberts Road onto Hilliard-Rome Road. Smith relayed this information to McKee. As McKee began to follow appellant's Acura in his cruiser, he personally observed appellant fail to signal as he turned his vehicle eastbound on Feder Road from Hilliard-Rome Road. McKee initiated a traffic stop at approximately 2:02 p.m. and began walking Blek around appellant's vehicle. Blek alerted to the presence of narcotics in the trunk area of the Acura, but no drugs were found.

{¶ 11} Smith arrived at the scene while McKee was still walking Blek around appellant's vehicle, and he engaged appellant in conversation. When the traffic stop was nearly completed, Smith told appellant "we're pretty much done here unless you want to tell me what's going on at your house." (Tr. Vol. 1 at 147.) When appellant told Smith he was just returning from the store when McKee stopped him, Smith confronted appellant with the information he had received from Blevins. Smith told appellant that based on the information he had received from Blevins and Akins, he believed he could obtain a warrant to search appellant's home. Appellant then admitted that he had a firearm in the home, and he indicated that he did not want his parents' home "torn up" during a search. (Tr. Vol. 1 at 117.)

{¶ 12} Appellant elected to consent to a search of the home, executed a consent to search form at approximately 2:23 p.m., and gave Smith the key to the house. The form was co-signed by Smith and Special Agent James Ratterman of the Department of Homeland Security, another member of the HIDTA task force.

Smith believed appellant signed the consent form because he was under the impression his parents' home would be torn up in the search if police were required to seek a warrant. Smith stated, however, "there was no threat of tearing anything up." (Tr. Vol. 1 at 152.)

{¶ 13} Appellant then rode back to his home in another officer's vehicle, followed by Smith, Ratterman, and McKee. When they arrived at appellant's home, Ratterman read appellant his Miranda rights while he and appellant were sitting in Ratterman's vehicle with Smith looking on from the opened passenger side window. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant proceeded to execute a written waiver of his Miranda rights in the presence of both officers. He then told Smith that a firearm and cocaine could be found in the home. Appellant also told Smith that he purchased a kilogram of cocaine for $42,000 and that he had already sold half that kilogram for $21,000 or $22,000.

{¶ 14} Smith, Ratterman, and appellant waited outside as other officers searched the home. An initial search of the home uncovered a .45 caliber handgun under the mattress in appellant's bedroom, where appellant had told Smith it could be found. When the officers searching the home indicated they could not find the cocaine, appellant volunteered to show them where it was. Appellant then led officers to a planter in the hallway outside his bedroom. A plastic baggie containing an off-white powdery substance, later identified as one-half kilogram of cocaine, was found either under or inside the planter.

{¶ 15} On December 5, 2014, a Franklin County Grand Jury indicted appellant for possession of cocaine equal to or in excess of 100 grams, in violation of R.C. 2925.11, a felony of the first degree, and having a weapon while under disability, in violation of R.C. 2923.13, a felony of the third degree. The cocaine possession charge was accompanied by a one-year firearm specification under R.C. 2941.141(A) and a major drug offender specification, pursuant to R.C. 2941.1410(A), which enhanced the degree of the cocaine possession charge to a first-degree felony.

{¶ 16} On February 12, 2015, appellant filed a motion to suppress both the physical evidence discovered in the search of his home and any statements appellant made to police as having been obtained in violation of appellant's constitutional rights under the Fourth and Fifth Amendments to the U.S. Constitution. The trial court conducted an evidentiary hearing on the motion on June 17, 2017, and on July 12, 2017, the trial court issued a decision denying the motion.

{¶ 17} The case proceeded to trial and plaintiff-appellee, State of Ohio, presented the testimony of Blevins, Smith, and McKee, as well as testimony of Hilliard Division of Police Sergeant Joshua Cohill and Hilliard Division of Police Lieutenant Douglas Lightfoot, who were members of the team that conducted the

search of appellant's home. Appellant took the stand and testified in his own defense. Appellant told the jury the cocaine and firearm had been planted at his home by Akins. A jury subsequently found appellant guilty of all charges, and the trial court sentenced appellant to an aggregate prison term of 15 years. Appellant timely appealed to this court from the judgment of the trial court.

II. ASSIGNMENTS OF ERROR

{¶ 18} Appellant assigns the following as trial court error:

[1.] The Trial Court Erred in Overruling Sieng's Motion to Suppress.

[2.] The verdict was supported by insufficient evidence.

[3.] The verdict is against the manifest weight of the evidence.

*State v. Sieng*, 10th Dist. No. 18AP-39, 2018 WL 6659562, at *1-3 (Ohio Ct. App. Dec. 18, 2018) (footnote omitted). On December 18, 2018, the appellate court affirmed the trial court's judgment. (*Id.*) On April 3, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Sieng*, 155 Ohio St.3d 1414 (Ohio 2019).

On March 25, 2020, Petitioner filed this habeas corpus petition. He asserts, as his sole ground for relief, that that police unconstitutionally searched his home in violation of the Fourth Amendment. In support of this assertion, Petitioner alleges that the police unlawfully obtained his consent to search the home by threatening to tear up the home if withheld consent. Petitioner complains that the trial court failed to address the issue consent when it denied his motion to suppress. Petitioner further contends that the state appellate court erroneously concluded that he had voluntarily consented to the police's warrantless search and instead should have remanded the case to the trial court for factual findings on the issue of consent. (ECF No. 1-1, PAGEID # 22-23.) Under these circumstances, Petitioner argues, and in view of the appellate court's unanticipated procedural ruling, he has been denied the opportunity to fully litigate his Fourth

5

Amendment in state court such that this Court may now address his Fourth Amendment Claim in this action.

## II. ANALYSIS

Petitioner's arguments lack merit. Fourth Amendment claims do not provide a basis for federal habeas corpus relief so long as the petitioner had a "full and fair opportunity" to raise the issue in the state courts, and "presentation of the claim was not thwarted by any failure of the state's corrective processes." *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (citing *Stone v. Powell*, 428 U.S. 465, 494–95 (1976)). The reasoning behind the bar on such claims is two-fold:

> One, the key purpose of federal habeas corpus is to free innocent prisoners. But whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty. [*Powell*, 428 U.S. at 490.] Two, exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution. Any deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great. *Id*. at 493, 96 S.Ct. 3037.

*Good v. Berghuis*, 729 F.3d 636, 637 (6th Cir. 2013), *cert. denied*, 135 S.Ct. 1174 (2015). Ohio provides criminal defendants a procedural mechanism whereby to raise a claim under the Fourth Amendment. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). Further, "the *Powell* 'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good*, 729 F.3d at 639. In other words, "the state court need do no more than 'take cognizance of the constitutional claim and rule in light thereof.'" *Riley*, 674 F.2d at 525. Thus, "[i]n the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedure for resolving the claim." *Id*.

Here, the state trial court conducted a hearing on Petitioner's motion to suppress evidence prior to issuing a decision denying the motion. Both the Ohio Court of Appeals and the Ohio Supreme Court affirmed the trial court's decision. Petitioner had the opportunity to litigate his Fourth Amendment claim in state court and to make the same arguments he now makes here. Nothing in the record reflects that the state-court proceedings were "sham proceedings," *Riley*, 674 F.2d at 525. Because the state court provided Petitioner with an "opportunity for full and fair consideration" of his Fourth Amendment claim, federal habeas corpus review of that Fourth Amendment claim is prohibited. *See Powell*, 428 U.S. at 494–95. This action must therefore be dismissed.

### III. DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED.**

The Clerk is **DIRECTED** to serve a copy of the petition and all subsequent filings on Respondent and the Attorney General of Ohio, Habeas Corpus Unit of the Corrections Litigation Section c/o: Brian.Higgins@ohioattorneygeneral.gov and Habeas.docketclerk@ohioattorneygeneral.gov.

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in

part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE